**EXHIBIT A**

1                   UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

   ************************************
4                                      *
   PAN AMERICAN AIRWAYS CORPORATION,   *
5                          Plaintiff,  *
                                       *
6      vs.                             *  No. 04-CV-10515-JLT
                                       *
7   ROBERT E. BARNES,                  *
                           Defendant.  *
8                                      *
   ************************************
9

10

11                  DEPOSITION OF ROBERT E. BARNES, a

12   witness called on behalf of the plaintiff, taken pursuant

13   to the provisions of the Federal Rules of Procedure,

14   before Deborah Battista, a Professional Stenographic

15   Reporter and Notary Public in and for the Commonwealth of

16   Massachusetts, at the LAW OFFICE OF PETER PIEL, 800

17   Turnpike Street, North Andover, Massachusetts 01845, on

18   Friday, May 13th 2005, commencing at 9:18 a.m.

19

20

21

22

23

24

1    responsibilities?

2    A.    I don't recall that.

3    Q.    Okay.  Can you summarize for me or give me your

4    impression as you sit here today as to what your

5    responsibilities were as the vice president of maintenance

6    for Pan American Airways?

7    A.    I was responsible for oversight and operation of the

8    maintenance department.

9    Q.    In that context, were you responsible for ensuring

10   that the maintenance department on behalf of Pan American

11   Airways performed its daily functions in compliance with

12   federal regulations?

13   A.    To the extent of my abilities, that would be

14   correct.

15   Q.    And also to the extent of your abilities, was it

16   your responsibility as the vice president of maintenance

17   to ensure that the maintenance department of Pan Am and

18   its employees performed their tasks in compliance with the

19   provisions of the General Maintenance Manual for Pan Am?

20   A.    I'm sorry, could you repeat that?

21   Q.    I'll try to simplify it.  While you were vice

22   president of maintenance at Pan Am, were you ultimately in

23   charge of making sure everybody did their job in

24   accordance with applicable regulations and Pan Am's manual

1    system?

2    A.    I'm not sure "ultimately" is the correct term.

3    Q.    Well, I'll take the word "ultimately" out of the

4    question.  Were you responsible for ensuring that the

5    employees of Pan American Airways in the maintenance

6    department did their jobs and that the company complied

7    with applicable federal regulations and the provisions of

8    Pan Am's maintenance manual?

9    A.    Through the organizational structure of the

10   maintenance department, that would be correct.

11   Q.    If you could now explain for me what you mean by

12   "through the organizational structure of the maintenance

13   department"?

14   A.    Sure.  Our operation was relatively large and

15   extended over a large geographical area.  I wasn't

16   available to review every job that was done at every

17   location at every opportunity for that job to be done.  My

18   job was at a higher level performing general oversight

19   ensuring that the tasks were accomplished to the best of

20   my knowledge through subordinates and reporting up through

21   the organizational structure; that was my responsibility

22   as I understood it at that time.

23   Q.    Okay.  In the course of your employment as vice

24   president for Pan American Airways, were there occasions

1   here.

2   BY MR. NADOLNY:

3   Q.   Start out with a couple of questions based on your

4   Answers to Interrogatories that you have previously

5   submitted.  I noticed in here that you moved from New

6   Hampshire to Massachusetts in October of 2003; is that

7   correct?

8   A.   That would be about correct, yes.

9   Q.   And did you notify anyone at Pan Am of your new

10  address after you moved to Massachusetts from New

11  Hampshire?

12  A.   I don't recall that, no.

13  Q.   Would you have had any reason to notify Pan Am of

14  your change of address?

15  A.   Nothing that I'm aware of.

16  Q.   Do you know if in the general vicinity of where you

17  work there's another individual by the name of Robert

18  Barnes?

19  A.   Presently?

20  Q.   I'm sorry, thank you for pointing that out to me.

21  At the time that this lawsuit commenced or about the time

22  the lawsuit commenced, do you now know, or do you know

23  that there's another individual working in the general

24  vicinity where you were working by the name of Robert

1    Barnes?

2    A.    Could you define "general vicinity"?

3    Q.    Well, somewhere on the Logan Airport property where

4    your office is located.

5    A.    Yes.

6    Q.    Is that Mr. Barnes related to you in any way?

7    A.    No.

8    Q.    Does he work for the FAA?

9    A.    No.

10   Q.    Do you have any knowledge or information of any

11   notice that Pan Am received about FAA concerns over engine

12   maintenance and preservation during the time that you were

13   employed there?

14   A.    I don't recall any.

15   Q.    Okay.  Can you describe for me the initial two-month

16   period of your employment by the FAA what sort of

17   activities took place during that time period?

18   A.    I'm not sure I understand what you're asking me.

19   Q.    I'll try it a different way.  When did you first go

20   to work for the FAA, approximately what date?

21   A.    August 10th 2003.

22   Q.    Between August 10th 2003, and let's say the end of

23   the year, December 31st 2003, what sorts of things did you

24   do as an employee of the FAA; did you go to training; for

```
 1    let's strike that.  How many such reviews have you had?
 2    A.    One.
 3    Q.    Do you know when that took place?
 4    A.    Last week.
 5    Q.    And that's the first review, first and only review,
 6    that you've had since being employed by the FAA?
 7    A.    That's correct.
 8    Q.    What was the result of that review, or what was
 9    communicated to you?
10    A.    It was communicated that they were quite happy with
11    my progress.
12    Q.    Do you consider that to be a favorable review?
13    A.    Yes.
14    Q.    Since becoming employed with the FAA, have you
15    received any formal criticism or the like which you would
16    characterize as being unfavorable towards your
17    performance?
18    A.    No.
19    Q.    Has anyone at the FAA ever made any comments to you
20    about this litigation?
21    A.    Yes.
22    Q.    Can you tell me what those comments were and who
23    made them?
24    A.    I had some comments with Ed Stalzer, and as I
```

1    recall, the general discussion centered around the fact

2    that he was originally named in the paperwork that we

3    received on the lawsuit, and I don't recall other specific

4    discussions.

5    Q.    So you don't have any recollection of anybody else

6    at the FAA talking to you about the lawsuit?

7    A.    I'm very cautious not to get into any discussions.

8    Q.    Have you received any pay increases during the time

9    of your employment with the FAA?

10   A.    Yes, I have.

11   Q.    To the extent that you know, have those pay

12   increases been consistent with those received by other

13   employees at the FAA during the same time period?

14   A.    Yes.

15   Q.    Have you received any job title changes during the

16   time of your employment with the FAA?

17   A.    No.

18   Q.    Is that consistent with your understanding of the

19   position that you've been hired to, or is that unusual in

20   your eyes in any way?

21   A.    I'm not sure I understand what you're asking.

22   Q.    I guess what I'm trying to get to is, Since you've

23   been employed by the FAA, have you received any sort of

24   promotion?

1    A.    No.

2    Q.    Have you expected to receive any sort of promotion

3    during this time that you have been employed by the FAA?

4    A.    I have not put paperwork in requesting any.

5    Q.    Is it your intention to do so?

6    A.    At this time, no.

7    Q.    Have you now cleared your 12-month probationary

8    period with the FAA?

9    A.    Yes, I have.

10   Q.    Are you still considered a probationary employee in

11   any way?

12   A.    I'm not clear on the details, but you're considered

13   a provisional employee, I believe it's called, until three

14   years.  I'm not positive of that term.

15   Q.    Do you know what the significance of being

16   considered a provisional employee as opposed to an

17   employee is?

18   A.    I believe it's at that point, they consider you a

19   permanent employee.  I'm not positive on that.

20   Q.    You, in your Answer and Counterclaim in this

21   lawsuit, have alleged that you have suffered mental and

22   physical pain, emotional suffering and distress, and an

23   increase in your blood pressure; do you recall making

24   those allegations?

1    A.    Yes.

2    Q.    Have you reported any of those items or matters to

3    any medical professional at any time?

4    A.    Yes.

5    Q.    Can you tell me to whom and when you  -- among the

6    medical professionals who have treated you -- you have

7    reported any of those conditions?

8    A.    Dr. Steven Barrett, S-T-E-V-E-N.

9    Q.    And what did you report to Dr. Barrett and when?

10    A.    I don't recall the specific dates, but I've seen him

11    on a number of occasions and reported that I've been under

12    a great deal of stress; that it's been affecting my

13    personal life; and I have had a number of instances of

14    chest pain and blood pressure increases that I believe are

15    related to.

16    Q.    And would those reports, your reports of those

17    situations, to Dr. Barrett be reflected in your medical

18    records that he maintains?

19    A.    I would have expected that.

20    Q.    Have you had a chance to look at the medical records

21    that Dr. Barrett has provided and that your counsel has

22    provided to Pan Am?

23    A.    I have.

24    Q.    Do you recall in those records seeing any references

```
 1    to any reports of the items that you've described before?
 2    A.    I believe there were several.
 3    Q.    Prior to your employment with Pan Am, had you had
 4    any problems with your blood pressure?
 5    A.    Yes.
 6    Q.    Were you seeking treatment for that condition prior
 7    to your employment with Pan Am?
 8    A.    Yes.
 9    Q.    During your employment by Pan Am, did you continue
10    to have problems with high blood pressure?
11    A.    Yes.
12    Q.    During your employment with Pan Am, did you continue
13    to seek medical treatment for problems with high blood
14    pressure?
15    A.    Yes.
16    Q.    And since resigning from your employment with Pan
17    Am, have you continued to have problems with high blood
18    pressure?
19    A.    Yes, I have.
20    Q.    Have you continued to seek medical attention for
21    those problems?
22    A.    I have.
23    Q.    Referring to your claim that you have suffered
24    mental and physical pain, emotional suffering and distress
```

```
 1    and increasing blood pressure, can you tell me whether or
 2    not for any of those conditions since  -- strike that.
 3    With respect to those conditions of mental and physical
 4    pain, emotional suffering and distress and an increase in
 5    your blood pressure, had you ever sought medical attention
 6    apart from blood pressure for any of those conditions
 7    prior to your employment by Pan Am?
 8    A.    Could you repeat that question?
 9    Q.    Sure, I'll try.  That was not very eloquent on my
10    part.   With respect to your claim of mental, physical
11    pain, emotional suffering and distress, had you ever
12    sought medical attention or complained of those conditions
13    to any medical professional at anytime prior to your
14    employment by Pan American Airways?
15    A.    Yes.
16    Q.    Can you tell me who you reported that to, and what
17    the conditions were that you reported?
18    A.    I don't recall times or dates or the exact
19    circumstances, John, but I did have a problem at one time
20    with seizures and had some stress related to the seizures
21    as well.
22    Q.    And do you remember the name of any physician whom
23    you sought help from in connection with those conditions?
24    A.    Dr. Andrew Cole.
```

1    Q.    Did you seek any medical assistance from Dr. Cole
2    during the term of your employment by Pan Am?
3    A.    Yes, I did.
4    Q.    For those same conditions that you have just
5    described?
6    A.    For the seizures, he's a neurologist.
7    Q.    And since the end of your employment by Pan Am or
8    with Pan Am, have you sought medical attention from Dr.
9    Cole?
10   A.    For the control of the seizures, yes.
11   Q.    Can you identify any other doctor or medical
12   professional from whom you sought medical attention for
13   mental and physical pain, emotional suffering and distress
14   in the period prior to your employment by Pan Am?
15   A.    I did see a nurse, Jean Anscom, at Beverly Hospital
16   for stress control techniques at approximately the time I
17   had the seizures.
18   Q.    Can you think of any other doctor from whom you
19   sought medical attention for mental or physical pain,
20   emotional suffering or distress prior to your employment
21   by Pan Am?
22   A.    For physical pain?
23   Q.    Yes.
24   A.    Yes.

| | |
|---|---|
| 1 | Q.   Can you tell me who that was, and what it was for? |
| 2 | A.   Dr. John Sherman, and ankylosing spondylitis. |
| 3 | Q.   Can you in layman's terms tell me what that |
| 4 | condition is about? |
| 5 | A.   It's calcification of the spine and hardening of |
| 6 | tendons and tissue such as arteries. |
| 7 | Q.   Does that condition result in your experiencing |
| 8 | physical pain? |
| 9 | A.   At times, I have severe pain from it. |
| 10 | Q.   Did it cause you any emotional suffering or |
| 11 | distress? |
| 12 | A.   During the periods of pain, it can cause some |
| 13 | significant distress. |
| 14 | Q.   Did you also seek treatment for that condition |
| 15 | during the term of your employment by Pan Am? |
| 16 | A.   Yes, I did. |
| 17 | Q.   Do you continue to seek treatment for that condition |
| 18 | since your employment with Pan Am? |
| 19 | A.   If I have a flare-up, I do. |
| 20 | Q.   Can you think of any other physical or mental health |
| 21 | professional from whom you sought assistance for any sort |
| 22 | of malady prior to your employment by Pan Am? |
| 23 | A.   Could you define -- |
| 24 | Q.   Well, with respect to mental, physical pain, |

```
 1    emotional suffering, distress, any other doctors, medical
 2    or otherwise, from whom you sought any assistance with
 3    respect to those conditions?  I see we've got Steven
 4    Barrett, Andrew Cole, Jean Anscom, the nurse, and Dr. John
 5    Sherman; is there anybody else?
 6    A.    I was also seen recently, actually in the last month
 7    or so, a cardiologist, Dr. Richard Goldman.
 8    Q.    Had you seen Dr. Goldman prior to working for the
 9    FAA?
10    A.    No.
11    Q.    How about prior to working for Pan Am?
12    A.    No.
13    Q.    When is the first time you saw Dr. Goldman?
14    A.    About six weeks ago, roughly, I don't recall the
15    exact date.
16    Q.    Can you identify for me any  -- besides Steven
17    Barrett and Dr. Goldman -- any doctors, health
18    professionals, who you have seen regarding mental or
19    physical pain, emotional suffering or distress since the
20    commencement of the litigation?  You've mentioned speaking
21    to Dr. Barrett.  I'm asking if there are other doctors
22    with whom you have spoken about this.
23    A.    I have seen emergency room doctors at Lawrence
24    General Hospital and a cardiologist there, but I don't
```

1   recall their names.

2   Q.    When did you see the emergency room doctors at

3   Lawrence General Hospital?

4   A.    I don't recall the exact dates.

5   Q.    Do you recall generally the timeframe; was it in the

6   year 2003 or 2004 or 2005?

7   A.    It would have been at least once last year and twice

8   within the last six weeks.

9                        MR. NADOLNY:    I don't believe,

10  Peter, that I have seen any documents related to those,

11  any of those visits.  So just note that in the medical

12  records that have been produced, there are no records that

13  pertain to any of those visits, and to the extent that Mr.

14  Barnes is going to attempt to tie any of those visits to

15  his claims in this case, I would like to have you produce

16  copies of those records.

17                        MR. PIEL:    We will try to get you

18  copies.

19                        MR. NADOLNY:    Thank you.

20  Q.    With respect to the claims that you are making

21  against Pan Am in this matter, do any of them relate to

22  any treatment that you or associated with any treatment

23  that you received from Dr. Patrick Clarity?

24  A.    Dr. Clarity was my primary care doctor while I was

1    employed at Pan Am, so I'm not sure what you're asking

2    about that.

3    Q.    Have you seen Dr. Clarity for any treatment since

4    the end of your employment with Pan Am?

5    A.    No.

6    Q.    Okay.  How about Dr. Cooley Barrett, have you seen

7    Dr. Cooly Barrett since the end of your employment with

8    Pan Am?

9    A.    No.

10    Q.    How about Dr. William Danford, have you seen Dr.

11    William Danford since the end of your employment with Pan

12    Am?

13    A.    No.

14    Q.    Charles LaFreniere, have you seen Charles LaFreniere

15    since the end of your employment with Pan Am?

16    A.    No.

17    Q.    Dr. Lucas Kolm, K-O-L-M, ER physician at Wentworth

18    Douglas Hospital, have you seen Dr. Colm since the end of

19    your employment with Pan Am?

20    A.    No.

21    Q.    How about Dr. Matthew Morman?

22    A.    No.

23    Q.    How about Dr. John Novello, have you seen Dr.

24    Novello since the end of your employment with Pan Am?

```
1    A.    No.

2    Q.    Has the existence of this lawsuit adversely affected

3    your employment at the FAA?

4    A.    I don't know.

5    Q.    Did you have occasion to be admitted to the hospital

6    in early September of 2004?

7    A.    I may have.

8    Q.    If I mentioned perhaps September 8th or September

9    9th of 2004, do those dates prompt your memory as to

10   whether or not you were admitted to the hospital at around

11   that time?

12   A.    Off the top of my head, it does not.

13   Q.    Unfortunately, I don't have extra copies of these,

14   but I'm not going to introduce it as an Exhibit but show

15   them to Mr. Piel and ask him if he has any problem with

16   them.

17                        MR. NADOLNY:    (Handing

18   documents.)  I would like to show that to the witness and

19   see if it prompts his memory, the arrow at the top.

20   Q.    I'm going to show you a document which we're not

21   going to mark as an Exhibit, but it's a printout of some

22   sort from Family Medicine Associates, Manchester office.

23   It says, "Patient, Robert Barnes"; the date of this report

24   appears to be 11/8/2004.  It does reference Steven
```

```
 1    Barrett, the doctor that you referred to before, and I
 2    would like to direct your attention under the subjective
 3    heading called "Hypertension, Chief complaint."  If you
 4    take a look at the sentence that appears in that little
 5    heading.  (Handing document.)
 6    A.    (Reading.)  Okay.
 7    Q.    If I could just have that back.
 8    A.    (Handing document.)
 9    Q.    Having taken a look at that document, does that
10    refresh your memory as to whether or not you went to the
11    hospital sometime in September of 2004?
12    A.    That may be the date.  I don't recall the date, but
13    from what that says, I did.
14    Q.    Do you have any recollection or memory of why you
15    went to the hospital or may have gone to the hospital
16    early September, 2004?
17    A.    Chest pain.
18    Q.    And is Lawrence General Hospital the hospital that
19    you would generally go to, the closest emergency room?
20    A.    Correct.
21    Q.    And can you identify any event or circumstances that
22    were taking place at about that time, early September,
23    that might have caused you -- if there were any -- that
24    might have caused you to allegedly have chest pains to
```

| | |
|---|---|
| 1 | visit the hospital with? |
| 2 | A. At this time, I don't recall. |
| 3 | Q. Just take a look at a few things here, and we may be |
| 4 | coming close to the end. You allege in your Counterclaim |
| 5 | that Pan Am has defamed you to a variety of different |
| 6 | persons or constituencies; do you recall that? |
| 7 | A. I don't recall the exact wording of the claim. |
| 8 | Q. Do you recall making a claim for defamation? |
| 9 | A. Yes. |
| 10 | Q. Can you tell me how in the eyes of the general |
| 11 | public you have been damaged as a result of this lawsuit? |
| 12 | A. When the original documents were delivered to the |
| 13 | fire station, they were opened and shown to a number of |
| 14 | individuals, and that information was passed on to others |
| 15 | on the airport which I feel affected my integrity, and I |
| 16 | had a number of comments from people who had seen them. |
| 17 | Q. Can you tell me who made those comments? I'm a bit |
| 18 | confused because earlier on, I asked if you had any |
| 19 | discussions or conversations with anybody other than your |
| 20 | lawyer about the lawsuit, and you had indicated no; that |
| 21 | you kept that very quiet; and I would like to know who |
| 22 | else you might have had discussions with. |
| 23 | A. Just to be clear, you asked if I had discussions |
| 24 | about the lawsuit. I didn't discussed the lawsuit. I |



U.S. Department
of Transportation

**Federal Aviation
Administration**

NE-FSDO-05

2 Al McKay Avenue
Portland, ME 04102-1999
207 780-3263



DEC 04 2003

Certified-Return Receipt

Mr. John Nadolny
Agent for Service
Pan American Airways
14 Aviation Avenue
Portsmouth, NH 03801

Dear Mr. Nadolny:

File Number: 2003NE050068

Recent FAA surveillance indicates an absence of adequate inspection, storage and preservation procedures on the engine that is presently installed in the number 1 position on B-727, N363PA. The Pan American Airways, Corp. presently leases the aircraft from Guilford Transportation Industries, Inc. The engine in question is a used Pratt & Whitney JT8D, serial number 700225, that was previously installed on B-727, N7253U. That aircraft had been previously retired by United Airlines and stored in the desert before it was purchased and flown to Pan Am's maintenance base at Pease Airport, NH (PSM).

On August 8, 2002, N7253U arrived at PSM where it was parked and designated as a "part-out" aircraft that would be scrapped after all the useful parts had been removed. Engine serial number 700225 remained installed in the number 2 position for the next 11 months. A diligent search of available records reveals no record of any engine runs, preservation or other storage precautions during the 11 months. Interviews with key Pan Am personnel in the engine, inspection, maintenance and records departments confirm that "part-out" aircraft/engines were not placed in any storage or preservation program. FAA surveillance during the period confirms there were no engine inlet or exhaust covers installed as required by storage programs. On 7-19-2003, the number 2 engine was removed from N7253U to replace the failed number 1 engine on N363PA.

The Manufacturer's Manuals and Pan Am's Maintenance Manuals (GMM 4.16.1 / M&IP vol 5), require specific storage and preservation precautions to maintain airworthiness during extended "out of service" periods. It is now clear that the required storage precautions were not taken. In spite of the absence of proper storage, the unpreserved engine was received as serviceable and installed on N363PA by Pan Am. This determination of airworthiness and subsequent return to service was accomplished without the benefit of a borescope or any other internal inspection of the unpreserved

2

engine. This failure to fully inspect an engine after 11 months of unprotected storage constitutes an inadequate and unacceptable determination of airworthiness.

Our concern about the above issue is exacerbated by the fact that the number 3 engine (S/N 696503), on the same leased aircraft has a very similar history of inadequate long-term storage and no record of preservation. Prior to installation, Pan Am used inadequate inspection criteria to determine that the unpreserved engine was airworthy and then returned it to service without a thorough internal inspection.

This is to inform you that this matter is under investigation by the Federal Aviation Administration. We wish to offer you an opportunity to discuss the incident personally and submit a written statement. If you desire to do either, this should be accomplished within 10 days following receipt of this letter. Your statement should contain all pertinent facts and any mitigating circumstances that you believe may have a bearing on the matter. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely,

Paul W. Hubbard
Principal Maintenance Inspector

Enclosure
Privacy Act Notice



U.S. Department
of Transportation

**Federal Aviation
Administration**

NE-FSDO-05

2 Al McKay Avenue
Portland, ME 04102-1999
207 780-3263



$\frac{3}{5-13-05}$ ck

December 23, 2003

Mr. John Nadolny, Senior Vice President
Pan American Airways, Corp.
14 Aviation Avenue
Portsmouth, NH 03801

Dear Mr. Nadolny:

This letter is written to thank you and Pan Am's Maintenance Managers for joining this office, the FAA Engine Certification Office, the Boston Aircraft Evaluation Group and other FAA Regional Staff Personnel for the telephone conference on Thursday afternoon, December 18, 2003. We determined the conference was necessary to clarify the issues regarding the airworthiness of several P&W JT8D engines. We felt these engines had not received adequate preservation and/or storage precautions during extended out of service periods. We would like to use this opportunity to reiterate and review some of our observations and conversations regarding the engine status concerns.

Our previous research had determined the following suspect engines had not been properly stored or preserved and may require further maintenance or inspection to ensure continued airworthiness:

N363PA – # 1 Engine - S/N 700225 – 350 days out of service
        # 2 Engine - S/N 696648 – 536 days out of service
        # 3 Engine - S/N 696503 – 257 days out of service

N364PA - # 1 Engine - S/N 696573 – 92 days out of service
        # 2 Engine - S/N 700330 – 91 days out of service

N362PA - # 3 Engine - S/N 700105 – 311 days out of service

There maybe additional engines (on and off wing) that will fall into the same category. However, our immediate focus is on the above engines that are presently installed on active Pan Am aircraft.

In the interest of public safety, we questioned the adequacy of the airworthiness determination that received these unpreserved engines and then returned them to service on active Pan Am aircraft. In a meeting at the Pan Am facility on 12/17/2003, the FAA Representatives were advised that Pan Am considered the above engines to be airworthy and Pan Am would continue to operate the engines in commercial passenger service. This raised the level of our concern, which led to numerous meetings and conferences on the subject. During an afternoon telephone conference on 12/18/2003, Pan Am referred to their letter of 12/16/2003. This letter states Pan Am's belief, "that the Engines were and continue to be airworthy and that their operation on N363PA poses no threat to public safety". Pan Am also explained how they intend to consult with an engineering firm and other engine experts to develop a plan for submission to Pratt & Whitney. This plan is designed to resolve the FAA's engine airworthiness concerns. The FAA again expressed concern about the continued operation of these suspect engines, especially the three engines on N363PA. Following some discussion, Pan Am stated: "Our intent is to park N363PA until this matter is resolved". In the public interest, the FAA emphasized the importance of a swift resolution of this issue. Pan Am agreed to work directly with the Engine Certification Office and keep them appraised of the situation.

This office shares the safety concerns expressed by the Engine Certification Office and hopes Pan Am will devote whatever resources are required to quickly resolve this important safety issue. If there is anything this office can do to assist in the swift and safe resolution of this issue, please feel free to contact us.

For your convenience, we have enclosed a copy of a Pratt & Whitney, JT8D Service Information Report regarding correct engine preservation. The report is dated April 2001, but we have been advised that Pratt & Whitney has made no recent changes to the recommended preservation procedures.

Sincerely,

Paul W. Hubbard
Principal Maintenance Inspector

Enclosure

## Correct Engine Preservation
## Prevents Operational Problems and Engine Failures

JT8D Engines, that are not preserved correctly, can experience contamination and surface damage (corrosion) that will impact the ability of the engine to be returned to service in a safe condition. In some cases, this contamination and corrosion can cause an engine operational problem and even an engine failure. Customers must be aware of the consequences of improper and/or incomplete engine preservation. This will insure engines are returned to service, in satisfactory condition, without the additional expense and time that is necessary when the engine was not preserved correctly.

> NOTE: The required engine preservation schedules, and instructions, are provided in the following documents:

♦ JT8D –1 through –17AR Engines:
> Maintenance Manual (P.N. 481671), 72-00, Engine Servicing & respective AMM Engine Manual (P.N. 481672), Servicing-02, -03 & -04

♦ JT8D-200 Series Engines:
> Maintenance Manual (P.N. 773127), 72-00-00, Servicing-00 & respective AMM Engine Manual (P.N. 773128), 72-00-00, Storage-01

There has been a recent increase in engines that have been inactive and have not been correctly preserved. Significantly higher maintenance activity and costs are necessary before these engines can be safely returned to service. These engines can require removal from the airplane, extensive disassembly, inspection, and repair.

P&W JT8D Customer Technical Service must review each case before any specific maintenance recommendations can be made. Customers should provide a list of the circumstances (inactive period, any preservation accomplished, location and atmospheric conditions during inactivity, etc.) to the local P&W Field Office. The Field Office will then initiate a Cactus Message, to the JT8D Assistant Model Manager, requesting the P&W recommendations for that particular engine.

Frank Malek

\*\* TOTAL PAGE.01 \*\*